In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-23-00211-CR

**FABIAN MAKELL MIRANDA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 253rd District Court**
**Liberty County, Texas**
**Trial Cause No. CR34904**

## MEMORANDUM OPINION

A jury convicted Fabian Makell Miranda of murder and sentenced him to forty years' incarceration in the Texas Department of Criminal Justice. *See* Tex. Penal Code Ann. § 19.02(c). In six issues on appeal, Miranda challenges the sufficiency of the evidence to support his conviction, asserts multiple jury charge errors, and contends that he received ineffective assistance of counsel at trial. We affirm.

## Background

It is undisputed by both parties that Miranda shot and killed his stepfather Jose in the late evening hours on November 4, 2019. At trial Miranda claimed self-defense and defense of another, his mother, Clarissa.

### Vicki Gardiner

Vicki Gardiner is a law enforcement officer for Liberty County Constable Precinct 5 and was on patrol the night of November 4, 2019. Around midnight, Gardiner received a call from dispatch instructing her to go to a Liberty County residence, "clear the scene, [and] make sure it was safe." When she arrived, she observed evidence of a shooting, and a man was lying on the kitchen floor. After searching to make sure no one else was in the house, she took photographs of the scene but was not asked to take pictures of Miranda or any injuries he may have had. Gardiner confirmed there were multiple law enforcement investigators at the home that night. Copies of the photographs she took at the scene were admitted at trial without objection. Gardiner made an in-court identification of Miranda.

### Bruce Sims

Bruce Sims has been employed as a deputy with the Liberty County Sheriff's Office for sixteen years. In the early morning hours of November 5, 2019, Sims was dispatched to a residence in Liberty County regarding a shooting. Sims and another officer arrived at the home and met with a female and two males, including Miranda.

Sims identified Miranda in court. According to Sims, the female was Miranda's mother, Clarissa Hernandez, and the male was Juan Morales, a family friend who lived on the same property. Sims observed that both Miranda and his mother had blood on their bodies, and he described them as "emotional." Sims then went into the residence and met with other investigators. Sims was informed that Miranda had "shot his stepdad[,]" so he placed Miranda in handcuffs, and "bagged his hands." Sims then read Miranda his *Miranda* rights and questioned him while recording the interview via his car's video system and a pocket audio recorder. A copy of the recording was admitted at trial and a portion of the video was played for the jury.

Sims testified that Miranda appeared intoxicated, that he could smell alcohol on Miranda's breath, and that Miranda was slurring his speech. During his conversation, Miranda appeared calm and collected, did not appear upset or shaken, and Miranda did not appear to have been in a life-or-death struggle. Miranda told him that he and the victim were hanging out, drinking beer, and having a good time before the shooting. Miranda stated that his mother and stepfather were fighting but Jose had not hit his mother "yet." Miranda told Sims multiple times during the conversation that Jose threatened to kill Miranda or his mother. Miranda told Sims that before shooting Jose, he had Jose in a headlock. Miranda never told Sims that Jose had a weapon. In Sims's opinion, Miranda "had control of the threat." Sims

3

opined that a person is not authorized to use deadly force against someone who threatens you but does nothing else.

**Clarissa Hernandez**

Clarissa testified she was married to Jose for seven years and is Miranda's mother. Jose was Miranda's stepfather. At the time of the shooting, Miranda lived next door to Jose and Clarissa. Clarissa described her husband's relationship with Miranda as "the best of friends." She testified that on the night of the shooting, Jose threatened her, Miranda and Jose got into a fight, Jose continued to threaten them both, and Miranda shot Jose in the head.

On the day of the shooting, Jose, Clarissa, and Miranda were celebrating Miranda's winning a 50/50 custody arrangement of his child. The group went to two bars and later ended up back at their home that night, after drinking all day. When they arrived back home, Clarissa went to bed and Jose, Miranda and a family friend, Juan Morales, continued to party outside. Eventually, Morales went home as well. Clarissa recalled that she went to bed when they returned home because she got into a fight with Jose over a lawn mower Clarissa had purchased. According to Clarissa, when Jose would become intoxicated, he would get into a fight that would turn physical, and Miranda had witnessed these fights previously. She described other incidents in which Jose physically attacked her in the past, including a time Jose pulled a gun on her during an altercation.

4

That night after Clarissa when to bed, Jose and Miranda stayed outside listening to music and drinking. Eventually, Clarissa fell asleep. Later Jose came into the house and woke Clarissa up telling her, "I'm leaving this bitch; and before I do, I'm going to kill you." Clarissa testified that Jose did not have a weapon, but there were weapons in the house and in his truck. After Jose woke her up, she tried to take his duffle bag that he was packing and told him "[y]ou're f-ing drunk. Take your ass to bed." Clarissa and Jose immediately began fighting and Jose threw Clarissa over the bed. According to Clarissa, Jose then got on top of her, and they started hitting each other. She stated that she believed Jose was going to kill her, and she feared for her life. When Miranda walked in, Jose did not hit Clarissa in front of Miranda, but she believed Miranda "did hear all the commotion as he was walking through the front door[.]" Miranda told Jose, "You don't want to tell my mother that." Jose then "shrugged into [Miranda's] shoulder…like he was starting crap with him[,]" and Jose and Miranda began to fight. Clarissa described the fight as an "[a]ll-out brawl." Clarissa never saw Jose pull or grab a weapon during the fight. They locked the guns in their home because Jose had "already pulled a gun on [Miranda] just a year prior." Clarissa later told the police that their rifles were at Miranda's house, and other guns were locked in a safe and Jose did not have the code. But she also testified that she had multiple unsecured guns around the house for her own protection.

5

Clarissa testified that Jose threatened to kill Miranda, and Miranda pulled a gun out of his pocket. According to Clarissa, Jose then tried to take the gun out of Miranda's hand. Clarissa stated that they both continued to fight and Miranda "tr[ied] to calm Jose down" by telling him "Jose, I'm not playing with you. Just go to bed." She believed initially that Jose fired the gun. After Miranda shot Jose he told Clarissa, "Mom, I'm sorry, and I know I'm going to go away for a long time."

**Ann Marie Mitchell**

Ann Marie Mitchell testified she is currently a warden with the Liberty County Sheriff's Office Jail but was previously employed as an investigator and was part of a team of investigators who were on this case. According to Mitchell, on the night of the shooting, she was assigned to investigate the home and wore a body camera when she spoke to Clarissa. A copy of her body-camera footage was admitted at trial and played for the jury. Mitchell recalled that Clarissa told her that Jose had previously pulled a gun on his ex-wife, that Jose started the fight and slapped Clarissa on her head, and that she hit him back.

**Clinton Travis Pierce**

Clinton Travis Pierce is a patrol sergeant with the Liberty County Sheriff's Office and was the lead investigator on this case. Pierce testified his duties included participation in the investigation of the scene of the crime on the night of November 4, 2019. Pierce testified that he has been called out to investigate

6

altercations or assaults "quite often[.]" According to Pierce, it is common for the scene of an altercation to show "[l]ots of damage," because "[w]hen people start[] fighting, a lot of bad things happen" and it is "very destructive." Pierce testified that when people are involved in altercations, they "definitely" have signs of being in the altercation, such as "a lot of blood[,]" and physical damage.

Pierce arrived at the home around one o'clock in the morning and was briefed by other investigators who had already spoken to Clarissa, Miranda, and Morales at the scene. They informed him there was a physical altercation inside the home, and "[t]hey were under the understanding that it was a very violent fight." Pierce testified that in other instances when he investigated other brawls, he observed "[d]islocated noses, bloody noses, blood running out of their ears, eyes swelled shut…lots of blood, teeth knocked out." Pierce stated he was looking for "[l]ots of physical damage…[and] this altercation specifically, with the information I was given, I was expecting a lot of stuff to be messed up." Pierce observed Jose lying in front of the oven in the kitchen of the home but did not observe any damage to the stove, the oven, the oven door, or any part of the kitchen, other than "one drawer that had a handle that was slightly turned down[,]" and he did not know how long the handle had been that way. He testified that the kitchen appeared as if someone were recently cooking or eating, but he said it was "very kept, clean" with nothing out of place, thrown about, or in array." All the knives were still in the knife holder, there was no

broken glass and "no signs to represent any struggle." Pierce noted there was evidence of someone being injured in the kitchen: blood spatter by the refrigerator, on the cabinet, and on top of the cabinet doors. Reviewing photographs of Miranda, Pierce testified there was no bruising on his face, no torn clothes, and only "two small gashes" right in the center of his back. He observed no defensive wounds on Miranda, and "nothing on his hands [or]…his fingernails."

According to Pierce, throughout an investigation, he tries to determine whether anything "had been manipulated[,]" to "disprove what had taken place[.]" In this case, he noticed that there was a very strong odor of bleach in the bathroom. Pierce testified the smell was so strong, that his eyes started watering as soon as he walked into the bedroom. Referring to a photo of the pistol that was lying on the floor near the decedent, Pierce testified it was unusual that one side of the weapon was covered in blood whereas the other side was almost completely clean except for "blood residue at the very muzzle point of the weapon."

Pierce testified he was present during Miranda's police interview at the sheriff's office, and Miranda's account of the shooting did not match what he observed at the scene. Pierce explained that he is a firearms instructor at the academy and he did not believe he would be able to manipulate a weapon in the way Miranda claimed to have done during the altercation; however, Pierce could not affirmatively say whether Jose was controlled in a headlock at the time of the shooting. Based on

8

his experience Pierce opined that lethal force was not authorized in this case, and that if he was in the same scenario, he did not believe that self-defense would apply to him. But, during cross-examination, Pierce testified that if Jose and Miranda were "struggling" over a weapon, Miranda has a right to kill Jose. Photographs of Jose's wallet, autopsy authorization, and body-bag tag were admitted into evidence. Pierce stated that he did not speak to Clarissa, nor did he take photographs of injuries on Miranda's body but noted that other officers did during their investigation.

**Juan Morales**

Juan Morales testified that he has been a friend of Jose's for about twenty years. According to Morales, he has had drinks with Jose many times and never observed Jose be violent with someone. At the time of the shooting, Morales was living in an RV on Jose's property. He lived on that property for a year and half before the shooting. Morales described Miranda as a "good kid[,]" and that he was close to Clarissa and Jose. Morales agreed that he does not know what happened behind closed doors within Jose's family, but he was there to testify that he never witnessed violent actions by Jose. He testified Jose could be loud when he was drinking, like "[h]e was just having a good time." According to Morales, Jose treated Clarissa "like a queen[,]" and he never observed Jose hit or push Clarissa.

**Dr. Selly Rae Strauch Rivers**

Doctor Selly Rae Strauch Rivers works as a forensic pathologist at Medical Management Services of Texas. She described her educational background, the responsibilities of a forensic pathologist and stated that she performed Jose's autopsy. Photographs from the autopsy, a copy of the autopsy report, and Jose's toxicology report were admitted as evidence. The toxicology report confirmed that Jose had been drinking and that he had a blood alcohol level of .204, over twice the legal limit. She stated that a high blood-alcohol level could affect a person's reasoning and rationality, and potentially make someone more aggressive, less predictable, less rational, and more violent. The autopsy report showed that Jose's cause of death was "a gunshot wound of head, perforating skull and brain[,]" and listed the manner of death as homicide.

**Andrew McWhorter**

Andrew McWhorter is a forensic scientist and DNA technical leader at the Texas Department of Public Safety Crime Lab in Houston. He testified he has been employed with the crime lab for over nineteen years. He detailed his educational and professional background and testified as to his job duties as a forensic scientist. He analyzed six swabs taken from the pistol, the magazine of the pistol, and blood from Jose. All the DNA swabs tested only showed the DNA of one individual, Jose. According to McWhorter, Miranda's DNA was not submitted, so he did not "have

10

an opportunity to compare his DNA to any of the profiles. But he did explain that if, as in this case, there is only a single source and not a mixed profile, a comparison from another individual is not typically submitted. Finally, he testified that DNA can be removed from a surface by using "bleach or a solution that destroys DNA that might be sitting there."

**Tori Lyn Radcliffe**

Tori Lyn Radcliffe testified for the defense. She stated that she met Miranda in school, and they later entered a romantic relationship. Radcliffe and Miranda have a child together. According to Radcliffe, Miranda has never been violent, aggressive or made split-second decisions. She stated that Miranda was "[v]ery close" to his mother and "best friends" with Jose. Radcliffe testified that when Jose would drink, alcohol would change him, and he would become "aggressive…flashy and try to show off and be cocky." When Jose would drink and become aggressive, Miranda would act as a "peacemaker" and try to break up the fight. "Most of the time," Miranda's intervention would work and calm Jose. She has witnessed Jose be verbally and physically aggressive with Clarissa. She recalled an occasion in 2018 when Jose was intoxicated and tried to fight six men outside a bar. Both Miranda and Radcliffe intervened in the fight to help Jose. She also recalled an incident in December 2018, in which an intoxicated Jose pulled a gun on Miranda. According to Radcliffe, after wrestling the gun away from Jose, he then tried to get another gun

11

from the gun safe, Miranda put Jose in a headlock, and Jose defecated himself, ending the fight.

**Fabian Miranda**

Miranda testified in his own defense. He described his relationship with Jose as the "father that I didn't have in my life." Miranda first met Jose when he was around fifteen years old and stated that his relationship "grew" from the first time he met him. Miranda testified they did many things together including, plumbing, carpentry, fishing, mudding, camping, and many family trips. Pictures of Jose and Miranda together were admitted into evidence.

On the night Jose was killed, Jose and Miranda had been celebrating first at some bars, then at home. At home, Jose, Miranda, and Morales went to a workshop on the property to continue drinking. Morales eventually left, and Jose and Miranda continued to drink. Miranda noticed a small lawnmower in the shop and began to "mess[] with it." Jose then started walking towards the home he shared with Clarissa. Miranda followed because he could tell Jose was "angry about something." Miranda walked into their home and saw Jose standing over Clarissa telling her, "Before I leave this bitch, I'm going to kill you." He then "nudged" Miranda on his shoulder. Jose then pulled his truck up to the house came back inside and began to argue with Clarissa again. According to Miranda, Jose then threatened to kill Clarissa again, and Miranda told Jose, "I would not say that if I was you." Miranda stated he told

Jose to go to bed and attempted to be a peacemaker, as that approach had worked in the past. Jose then went towards Miranda and they "started arguing, fighting, physical altercation." Miranda testified:

Q.      Did he attack you first, or did you attack him?

A.      He came at me first.

Q.      Then what happened?

A.      We were fighting within the living room and the kitchen.

Q.      Then what happened?

A.      And as we get into the kitchen, we're – we're still fighting, and I'm able to get him into like -- like a -- like a headlock.

Q.      Let's – let's talk about the headlock.

[DEFENSE COUNSEL]: : May I, Judge, for demonstration purposes?

THE COURT: Yes, sir.

Q.      (BY [DEFENSE COUNSEL]) If I'm Jose and you have me in this headlock, am I facing you or am I facing away?

A.      Your face is facing me.

Q.      Okay. So we've heard this being called a choke hold. This was not a choke hold, was it?

A.      I don't really know the difference.

Q.      So you had him in a headlock and his face was right next to you?

A.      Yes, sir.

Q.      His body is right next to you?

A.      Yes, sir.

Q.      Okay. What happens next?

13

A.     We're still arguing at each other. We're still fighting. We're still – he's trying to get out of what I'm holding him in. I'm still trying to hold him. I pull – I pull my weapon out.

Q.     Okay. At this point, did you think he was going to get loose from you or could get loose from you?

A.     Yes, sir, I did.

Q.     And at this point if he had gotten loose from you, what did you think would have happened?

A.     He would have killed my mother and myself.

Q.     So now what happens?

A.     So I -- I pulled my gun out, and I dropped the clip, and I put it to his head.

Q.     So when you dropped the clip, was there a bullet in the chamber?

A.     No, sir. I never kept one in the chamber.

Q.     The jury couldn't hear what you said.

A.     I said no, sir, I never keep one in the chamber.

Q.     So what did you do with this empty gun?

A.     I put it to his head.

Q.     And did you say anything to him?

A.     I do not recall.

Q.     Did he say anything to you?

A.     I'm sure words were being exchanged, yes.

Q.     Did it calm him down?

A.     No. It made matters worse.

14

Q.     When you pulled it, why -- what did you think was going to happen? What was your -- what was the purpose of pulling the gun at that point?

A.     Because I thought maybe if I pulled the weapon, he would have calmed down.

Q.     And did it have that effect?

A.     No, sir, it did not.

Q.     Was this also an act of you trying to be the peacemaker?

A.     Yes, sir.

[. . .]

Q.     If he would have said, "Stop, stop. Let's go to bed," what would have happened?

A.     I would have told him, "Okay. Let's go to bed. I'll see you tomorrow. Good night. I love you."

Q.     If he would have said anything at all that wasn't aggressive, what would you have done?

A.     I would have not shot Jose.

[. . .]

Q.     When you hold him in the headlock and you have the empty gun out and you hold it up there, what does he do?

A.     He starts fighting worse.

Q.     Worse. Is he saying things?

A.     Yes, sir, I'm sure.

Q.     Can you remember the exact words?

A.     I know that he said that he was going to kill me if he got out of the hold and kill my mother as well.

15

Q.     So what did you do next?

A.     I put the clip back in the gun.

Q.     And then what did you do?

A.     I pulled the slide back.

Q.     And what happened?

A.     And it didn't fully like -- the slide didn't fully go back.

Q.     So what did you do next?

A.     Like, I was able -- I don't know. I was able to, like, drop -- I don't know exactly what I did. I know I was able to get a bullet out and be able to put another one in and pull it back because it had -- like, the slide didn't go all the way back the first time.

Q.     Are you a gun expert?

A.     Absolutely not.

Q.     So -- and Jose can see now that you have loaded the gun. His head is right here. You're doing this where he can see it; is that correct?

A.     Yes, sir.

Q.     And so now what do you do with the gun that you've loaded in front of Jose?

A.     I put it to his head again.

Q.     And what happened? Did he stop struggling? Did he stop fighting?

A.     No, sir.

Q.     Did he stop making threats?

A.     No, sir.

Q.     What did you do?

A.     I shot Jose.

16

Q. You what?

A. I shot Jose.

Q. Do you have remorse over his death?

A. I wish he was here every day.

Q. When you shot that gun, did you believe your life was in danger and a threat to you to continue to live?

A. Yes, sir.

Q. Did you think your mother, her life was being threatened and her ability to continue to live?

A. Can you repeat that?

Q. Did you think your mother was in jeopardy too from Jose at that point?

A. Yes, sir.

Referring to photos from that night, Miranda identified injuries he received in the fight with Jose, including an abrasion in his neck, red marks on his arm and swelling under his right eye.

During cross-examination, he agreed that he showed more emotion in the courtroom than in police video taken the night Jose was killed. He also agreed the video showed he was calm, smiling and laughing, and at times appeared with a smirk. He testified that during the police interview "I was still intoxicated and in shock, I don't think I fully processed what had happened." He stated he did not see Jose hit Clarissa that night, nor did he see Jose with a weapon. Miranda agreed that during the interview at the jail, he described the headlock as "pretty tight, but not

17

tight enough to put [Jose] to sleep[.]" While in the headlock, Jose tried to punch him, but he was able to dodge it. Jose also patted Miranda's pocket, but Miranda agreed he was the one who pulled the gun out of his pocket, dropped the magazine, and put it to Jose's head, all while he had Jose in a headlock. Miranda agreed Jose said something about Miranda not being "man enough to use that gun" and was "egging" him on and saying, "Do it, do it, do it[.]" Miranda agreed he shot Jose while he still had Jose in a headlock. Miranda also agreed that he told the police that after the shooting, he put the gun in Jose's hand, but he denied using bleach to clean himself or the gun.

A copy of Miranda's police interview was admitted into evidence. In his police interview in the early morning hours of November 5, Miranda told the officers that he was outside drinking with Jose before the shooting. He stated that he noticed a new lawnmower outside and tried to pull on the lawnmower. He stated that they went inside, and Jose was threatening to kill Clarissa and Miranda. They began to fight in the kitchen and Miranda put Jose in a "chokehold" to hold him. According to Miranda, this was a "full-blown chokehold," because Miranda "did not want him to swing on" him or Clarissa. He told Jose to "chill the f[]ck out[,]" and told investigators this was not the first incident, that Jose had pulled a gun on him previously. While Jose was in the chokehold, he tried to punch Miranda, but Miranda dodged Jose's punch and Jose continued to threaten Miranda and Clarissa. He stated

18

that Jose was being "stubborn [and] stupid[,]" and started tapping Miranda's leg where he knew Miranda had his gun, taunting Miranda to use his gun. Miranda then stated he pulled his gun out, dropped the clip out of the gun and put the gun up to Jose's head without the clip. According to Miranda, Jose continued to taunt him and told him to pull the trigger, so he reloaded the clip into the gun and put the loaded gun back on Jose's head. He then told Jose that he cannot threaten to kill Clarissa, to which Jose said he did not "give a f[]ck about y'all[.]" Miranda said, "I'm to the point now where I'm tired of this sh[]t." According to Miranda, Jose said, "I don't give a f[]ck[,]" and then, "boom[,]" Miranda shot Jose. At this point of the interview, Miranda said, "You don't give a f[]ck about none of us, why should you be here?" He stated that he still had him in the chokehold when he shot him. He demonstrated how he loaded the gun while holding Jose in a chokehold. He stated, "Honestly, in all honesty, I shouldn't have done it. But I mean if you say that you don't care…[.]" The officer asked Miranda, "The question is going to come up: why didn't you do something else? Why did you kill him? In your own words, why did you kill him?" Miranda answered, "Because he just pushed me to that point."

At the conclusion of trial, the jury found Miranda guilty of murder and sentenced him to forty years imprisonment in the Texas Department of Criminal Justice. Miranda timely filed this appeal.

**Analysis**

*Issue Six - Sufficiency of the Evidence*

In his sixth issue, Miranda argues the evidence is legally insufficient to support his conviction for murder. We begin our analysis with this issue, because if it were sustained, the appropriate remedy would be to reverse and render a judgment of acquittal in Miranda's favor, triggering constitutional prohibitions against double jeopardy and making Miranda's other issues on appeal moot. *See Burks v. U.S.*, 437 U.S. 1, 18 (1978) (discussing double jeopardy).

A. Standard of Review

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id*. Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240

(Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper*, 214 S.W.3d at 13). We do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761-62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

In a homicide case, the defendant's state of mind is a question of fact for the jury to determine, and the jury may infer intent "from any facts in evidence which it

21

determines proves the existence of such intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967)). "It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." *Ex parte Thompson,* 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (internal citations omitted). Intent to murder can be inferred from circumstantial evidence, such as a defendant's acts, words, and the extent of the victim's injuries. *See Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014).

Whether the defendant acted in self-defense is a question for the jury to decide. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). When a defendant claims self-defense, the defendant bears the burden of production, which requires the production of some evidence that supports the defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton*, 804 S.W.2d at 914; Tex. Penal Code Ann. § 2.03). Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the defense. *Id*. The State need not produce evidence that refutes the claim of self-defense, but it must prove its case beyond a reasonable doubt. *Id*. A jury is free to accept or reject the evidence of self-

defense, and a jury verdict of guilty is an implicit finding against the defensive theory. *See id*.; *Saxton*, 804 S.W.2d at 914.

> In resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914.

B. Elements of Murder and Justification[1]

Unless Miranda's conduct was justified, Miranda committed murder if he intentionally or knowingly caused Jose's death, or if he intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Jose's death. Tex. Penal Code Ann. §§ 9.02; 19.02(b)(1), (2). Miranda does not challenge the sufficiency of the evidence that he intentionally shot Jose, causing his death. Rather, Miranda challenges the sufficiency of the evidence negating his two justification defenses: self-defense, and defense of a third person. Each of these justification defenses involved evidence related to the use of force.

The charge accurately instructed the jury, "The use of force against another is not justified in response to verbal provocation alone." *See id*. § 9.31(b)(1). It also correctly instructed the jury that Miranda would be justified in using force against

---

[1]We include only the elements raised by the evidence in this case.

Jose when and to the degree Miranda reasonably believed the force was immediately necessary to protect Miranda against Jose's use or attempted use of unlawful force. *See id*. § 9.31(a). The charge correctly instructed the jury, "'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the defendant." *See id*. § 1.07(a)(42). A hypothetically correct charge would have also instructed the jury that Miranda's belief that the force was immediately necessary is presumed to be reasonable if: Miranda knew or had reason to believe that Jose was committing or attempting to commit murder; and Miranda did not provoke Jose. *See id*. § 9.31(a)(1)(C)(2).

Each of Miranda's justification defenses also involved evidence related to the use of deadly force. The charge correctly instructed the jury, "'Deadly force' means force that is intended or known by the person using it to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *See id*. § 9.01(3). It also instructed the jury that if Miranda was justified in using force against Jose under the previous instructions regarding the use of force, Miranda would be justified in using deadly force against Jose when and to the degree Miranda reasonably believed the deadly force was immediately necessary: to protect Miranda against Jose's use or attempted use of unlawful deadly force; or, to prevent Jose's imminent commission of murder. *See id*. § 9.32(a)(1), (2). A hypothetically correct charge would have also included an instruction that Jose's belief that the

24

deadly force was immediately necessary is presumed to be reasonable if: Miranda knew or had reason to believe Jose was committing or attempting to commit murder; and Miranda did not provoke Jose. *See id*. § 9.32(b)(1)(C) (2).

Lastly, a hypothetically correct charge would have also instructed the jury that Miranda would be justified in using force or deadly force against Jose to protect Clarissa if: under the circumstances as Miranda reasonably believed them to be, Miranda would be justified, under the previous instructions, in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believed to be threatening Clarissa; and, Miranda reasonably believed that his intervention was immediately necessary to protect Clarissa. *See id*. § 9.33.

C. The Evidence Was Legally Sufficient

As discussed above, we must defer to the jury's responsibility to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. The jury was free to believe or disbelieve the testimony of appellant and the other witnesses. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). A reasonable jury could conclude that Miranda's statements to the police revealed Miranda's reason for killing Jose was not that he believed Jose to be an imminent threat, but that Miranda was "tired of this sh[]t" and felt that if Jose didn't "give a f[]ck about none of us, why should [he] be here?" "While motive is not by itself enough to establish

25

guilt of a crime, it is a significant circumstance indicating guilt." *Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) (citations omitted). The jury could have reasonably concluded that Miranda's actions that night, such as placing the gun in Jose's hand as he lay dead on the floor, the strong smell of bleach emanating from the house, Miranda's demeanor during his interviews with the police, and his statement that "in all honesty, he shouldn't have done it" were all signs of consciousness of guilt. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000).

The jury could also rationally reject Miranda's assertion that he reasonably believed his use of deadly force was immediately necessary to protect himself or Clarissa from Jose's use or attempted use of unlawful deadly force or to prevent Jose's imminent commission of murder. *See* Tex. Penal Code Ann. §§ 9.32, 9.33. Jose was certainly intoxicated and likely was enraged, but he was unarmed, and Miranda had him in a headlock when Miranda shot him. A rational jury could infer from Miranda's testimony that the headlock was secure enough that Miranda was able and dodge Jose's punches, draw his pistol, release the magazine, retrieve and reinsert the magazine, attempt to charge the pistol, clear a misfeed, and then successfully charge the pistol, all without Jose's escaping the headlock. The jury was free to conclude that at that point, it was not reasonable for Miranda to believe that

26

Jose was using or attempting to use deadly force against Miranda or Clarissa, nor for Miranda to believe Jose was imminently going to commit murder. *See id.*

A rational factfinder could also conclude that it was not reasonable for Miranda to believe that his use of deadly force against Jose was "immediately necessary" either to protect himself or Clarissa from Jose's use or attempted use of deadly force, or to prevent Jose from imminently committing murder. *See id.* Although Jose, while still in a headlock, continued saying that he would kill Miranda and Clarissa if he were to escape or be set free, Jose's verbal provocations alone were insufficient to justify Miranda's use of deadly force, and the jury could reasonably conclude that it was not reasonable for Miranda to believe Jose was an imminent threat. Despite Miranda's subjective belief that Jose would kill him or Clarissa if he did not shoot Jose, the jury was not required to presume Miranda's belief was reasonable, because the jury may have reasonably concluded from the evidence that Miranda neither knew nor had reason to believe Jose "was committing or attempting to commit" murder. *See id.* §§ 9.31; 9.32; 9.33.

Considering all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the elements of murder beyond a reasonable doubt and could have found against Miranda on his self-defense and defense-of-third-person justification defenses beyond a reasonable doubt.

27

*See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13; *Saxton*, 804 S.W.2d at 914. Accordingly, we overrule Miranda's sixth issue.

*Issues One Through Four - Jury Charge Error*

In his first four issues, Miranda argues that the trial court erred by failing to properly instruct the jury regarding his defenses pursuant to Texas Penal Code sections 2.03, 2.05, 9.32, and 9.33. *See* Tex. Penal Code Ann. §§ 2.03, 2.05, 9.32, 9.33.

A. Standard of Review

The trial court is required to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14; *see also Mendez v. State*, 545 S.W.3d 548, 551-52 (Tex. Crim. App. 2018); *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995) (internal citations omitted). "Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the

28

defense." *Id*. In addition to abstract definitions and instructions, the charge must include an application section "that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations… specifies the factual circumstances under which the jury should convict or acquit[.]" *Vasquez*, 389 S.W.3d at 366-67.

"Appellate review of purported error in a jury charge involves a two-step process. First, we determine whether the jury instruction is erroneous. Second, if error occurred, then an appellate court must analyze that error for harm." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003) and *Abdnor*, 871 S.W.2d at 731). If we determine error in the charge exists but the defendant did not object to the error at trial, we will reverse the conviction only if the error amounts to "fundamental error," which requires an appellant to demonstrate the error resulted in "egregious harm." *See Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1985); Tex. R. App. P. 33.1(a).

## B. The Charge

The charge included the following instructions regarding self-defense and defense of third person:[2]

---

[2]We have added paragraph numbers to aid our analysis.

## 4.   SELF-DEFENSE

[1] You have heard evidence that, when the defendant shot JOSE[] with a firearm, the defendant believed his use of deadly force was necessary to defend himself against JOSE[]'s use or attempted use of unlawful deadly force.

[2] The use of force against another is not justified in response to verbal provocation alone.

[3] Under our law, a person is justified in using force against another when and to the degree that he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force.

[4] The use of force is not justified if the actor provoked the other's use or attempted use of unlawful force.

[5] A person is justified in using deadly force against another if he would be justified in using force against the other in the first place, as set out above, and when [sic][3] he reasonably believes that such deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force, or to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

[6] Self-defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant.

---

[3]The applicable statutory language is "… when *and to the degree*…[.]" Tex. Penal Code Ann. § 9.32(a)(2) (emphasis added). Miranda does not complain about the charge's omission of this phrase.

## BURDEN OF PROOF- SELF DEFENSE

[7] The defendant is not required to prove self-defense. Rather, the State must prove, beyond a reasonable doubt, that self-defense does not apply to the defendant's conduct.

[8] "Reasonable belief" means a belief that would be held by an ordinary and prudent man in the same circumstances as the defendant.

[9] "Deadly force" means force that is intended or known by the person using it to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.

## APPLICATION OF LAW TO FACTS - SELF DEFENSE

[10] If you have found that the State has proved the offense of Murder beyond a reasonable doubt, you must next decide whether the State has proved beyond a reasonable doubt, that self-defense does not apply to the defendant's conduct.

[11] To decide the issue of self-defense, you must determine whether the State has proved, beyond a reasonable doubt, one of the following:

A.    The defendant did not believe his conduct was immediately necessary to protect himself against JOSE[]'s use of unlawful deadly force; or

B.    The defendant's belief was not reasonable.

[12] You must all agree that the State has proved, beyond a reasonable doubt, either element A or B listed above.

[13] If you find that the State has failed to prove, beyond a reasonable doubt, at least one of the elements A or B listed above, you must find for the defendant on the issue of self-defense, and find the defendant "not guilty."

[14] If you all agree the State has proved, beyond a reasonable doubt, each of the elements of the offense of Murder, and you also believe, beyond a reasonable doubt, that the defendant did not act in self-

31

defense, you must find against the defendant on the issue of self-defense, and you must next decide whether the State has proved beyond a reasonable doubt that the Defendant's conduct was not justified by a defense of a third person.

[15] When a person is attacked with unlawfully deadly force, or he reasonably believes he is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack.

[16] It is not necessary that there be an actual attack or attempted attack as a person has a right to defend their life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.

[17] Therefore, if you find from the evidence beyond a reasonable doubt that the defendant FABIAN MAKELL MIRANDA, shot JOSE[] with a firearm, as alleged, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, that from the words or conduct, or both, of JOSE[] it reasonably appeared to the defendant that his life or person was in danger and there was created in his mind a reasonable expectation of fear of death or serious bodily injury from the use of unlawful deadly force at the hands of JOSE [], and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself against JOSE[]'s use or attempted use of unlawfully deadly force, he shot JOSE[], then you should acquit the defendant on the grounds of self-defense; or if you have a reasonable doubt as to whether or not the defendant was acting in self-defense on said occasion and under the circumstances, then you should give the defendant the benefit of the doubt and say by your verdict, "not guilty."

32

[18] If you find from the evidence beyond a reasonable doubt that at the time and place in question the defendant did not reasonably believe that he was in danger of death or serious bodily injury, or that the defendant, upon the circumstances as viewed by him from his standpoint at the time, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself against JOSE[]'s use or attempted use of unlawful deadly force, then you should find against the defendant on the issue of self-defense.

**DEFENSE OF THIRD PERSON:**

[19] Under our law, a person is justified in using force or deadly force against another to protect a third person if, under the circumstances as he reasonably believes them to be, such person would be [sic][4] using force or deadly force to protect himself against the unlawful force or deadly force of another which he reasonably believes to be threatening the third person he seeks to protect, and he reasonably believes that his intervention is immediately necessary to protect the third person.

[20] A person is justified in using force or [sic] deadly force against another if the actor would be justified in using force against the other in the first place, as above set out, and when [sic] the actor reasonably believes that such force or deadly force is immediately necessary to protect oneself against the other person's use or attempted use of unlawful deadly force, or to prevent oneself against the other person's use or attempted use of unlawful deadly force [sic].[5]

---

[4]The instruction would more closely track the language of the Penal Code if it read: "… would be *justified, according to the instructions above, in* using force or deadly force…[.]" *See* Tex. Penal Code Ann. § 9.33(1) (italics added to emphasize variance).

[5]The instruction would more closely track the language of the Penal Code if it read: "A person is justified in using ~~force or~~ deadly force against another if the actor would be justified in using force against the other in the first place, as above set out, and when *and to the degree* the actor reasonably believes that such ~~force or~~ deadly force is immediately necessary to protect oneself against the other person's use or attempted use of unlawful deadly force, or to prevent *the other's imminent commission of murder* ~~oneself against the other person's use or attempted use of unlawful deadly force~~." *See* Tex. Penal Code Ann. § 9.32 (italics and strikethroughs added to emphasize variance).

[21] The actor's belief that the force or deadly force was immediately necessary is presumed to be reasonable if the actor (l) knew or had reason to believe that the person against [sic] deadly force was used did not provoke the person against whom the force was used [sic] and (2) was not otherwise engaged in criminal activity.[6]

[22] When a person is attacked with unlawful deadly force, or he reasonably believes he or a third person is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself or a third person from such attack or attempted attack.

[23] It is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.

[24] In determining the existence of real or apparent danger, you should consider all the facts and circumstances in the case in evidence before you, the previous relationship existing between the parties, if any, together with all relevant facts and circumstances going to show the conditions of the mind of the defendant at the time of the occurrence in question, and in considering such circumstances, you should place

---

[6]The instruction would more closely track the language of the Penal Code if it read: "The actor's belief that the force or deadly force was immediately necessary is presumed to be reasonable if the actor: (l) knew or had reason to believe that the person against *whom* deadly force was used *was committing or attempting to commit murder,* (2) did not provoke the person against whom the force was used, and (3) was not otherwise engaged in criminal activity." *See* Tex. Penal Code Ann. § 9.31(a)(1)(C) (2); 9.32(b)(1)(C) (2); (3) (italics added to emphasize variance).

yourselves in the defendant's position at that time and view them from his standpoint alone.

[25] Now, if you find from the evidence beyond a reasonable doubt that on or about November 4, 2019, in Liberty County, Texas, the defendant, FABIAN MAKELL MIRANDA did shoot JOSE [] with a firearm as alleged, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, that from the words or conduct, or both, of JOSE[], it reasonably appeared to the defendant that the life of CLARISSA[] was in danger and there created in his mind a reasonable expectation or fear of death or serious bodily injury to CLARISSA[] from the use of unlawful deadly force at the hands of JOSE[], and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect CLARISSA[] against JOSE[]'s use or attempted use of unlawful deadly force, he shot JOSE[], then you should acquit the defendant on the grounds of defense of a third person; and say by your verdict "NOT GUILTY."

*Issue One – Deadly Force*

In his first issue, Miranda argues the trial court erred by failing to instruct the jury regarding the circumstances under which a person is justified in using deadly force. Specifically, Miranda complains the phrase "to prevent oneself against the other person's use or attempted use of unlawful deadly force" which appears in paragraph 20, above, is "nonsensical [and an] incorrect statement of the law[.]" Miranda claims paragraph 20's improper wording resulted in harm because "it does not inform the jury on the correct law, that a person is justified in using deadly force to prevent murder (Sec. 9.32(b)) and to protect a third person (Sec 9.33)."

The State responds that the instruction in paragraph 20 does not constitute charge error because paragraph 19 provides a defense-of-third-person instruction

35

which tracks the language of section 9.33. But we conclude paragraph 19 does not accurately follow the language of section 9.33, which provides:

> A person is justified in using force or deadly force against another to protect a third person if:
>
> (1)     under the circumstances as the actor reasonably believes them to be, the actor would be *justified under Section 9.31 or 9.32 in* using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2)     the actor reasonably believes that his intervention is immediately necessary to protect the third person.

Tex. Penal Code Ann. § 9.33 (italicized to indicate missing language).

According to the statute's conditions, the State should have been required to disprove either that Miranda would be *justified in using* force or deadly force to protect himself or that he did not reasonably believe intervention was immediately necessary to protect Clarissa. But according to the wording of paragraph 19, the State could negate Miranda's defense-of-third-person defense by disproving that Miranda would be *using* force or deadly force to protect himself. This means that even if the jury believed Miranda was using force or deadly force to protect Clarissa, the State could still negate Miranda's defense-of-third-person defense by proving beyond a reasonable doubt that Miranda was not also using force or deadly force to protect himself. Therefore, contrary to the State's argument, we conclude paragraph 19 is erroneously worded. Neither paragraph 19 nor paragraph 20 constitutes an accurate instruction on the law regarding defense of a third person.

36

The State also argues that by using the phrase, "as above set out," paragraph 20 incorporates the deadly-force instruction contained in paragraph 5 which instructed the jury that deadly force may be used "to prevent the other's imminent commission of… murder[.]" We agree with the State's premise but disagree with its conclusion. Because the language of paragraph 5 does not restrict the word "murder" to a particular person, we agree it accurately instructed the jury Miranda would be justified in using deadly force to prevent his own imminent murder, Clarissa's imminent murder, or both. But we disagree the State's conclusion that the inclusion of two instructions on the same topic—one properly worded and the other improperly worded—does not constitute charge error. *See Hernandez v. State*, No. 02-17-00353-CR, 2019 Tex. App. LEXIS 911, at *20-22 (Tex. App.—Fort Worth Feb. 7, 2019, pet. ref'd) (mem op. not designated for publication).

When the trial court submits a defensive issue, "any flaw" in the charge on the defensive issue constitutes charge error necessitating evaluation of harm under *Almanza. See Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) (entrapment); *State v. Barrera*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1998) (self-defense). Based on these authorities, we conclude that the inclusion of a properly worded instruction does not render the improper wording of another instruction proper; instead, the presence of the properly worded instruction is a consideration

37

when evaluating, under *Almanza*, any harm resulting from the erroneously worded instruction.

Paragraph 20's inclusion of the phrase "to prevent oneself against the other person's use or attempted use of unlawful deadly force" constituted charge error, as did its omission of the phrase "to prevent the other's imminent commission of… murder." But because Miranda did not object at trial, we may reverse his conviction on this ground only if we conclude the error resulted in egregious harm, an issue we address below in conjunction with Miranda's fourth issue. *See Almanza*, 686 S.W.2d at 171; Tex. R. App. P. 33.1(a).

*Issue Two – Presumption of Reasonableness*

In his second issue, Miranda argues the trial court erred by failing to properly instruct the jury regarding a presumption of reasonableness he claims applies in this case. *See* Tex. Penal Code Ann. §§ 9.31(a), 9.32(b) and 2.05(b). As indicated above, whether a person's use of force or deadly force is justified depends, in part, on whether the person "reasonably believes" such force is "immediately necessary." *See id*. §§ 9.31(a), 9.32(a)(2). Under certain circumstances, a person's belief that force or deadly force is immediately necessary is presumed reasonable. *See id*. §§ 9.31(a)(1), 9.32(b). Claiming evidence of those circumstances was introduced during the trial, Miranda argues the trial court was required to include properly worded presumption-of-reasonableness instructions in the charge. Specifically,

38

Miranda claims the trial court erred by: (1) failing to include any instruction on the presumption of reasonableness in the self-defense section of the charge; (2) including an improperly worded instruction regarding the presumption of reasonableness in the defense-of-a-third-person section of the charge; and (3) omitting instructions on the burden of proof in terms of the presumption of reasonableness.

Texas Penal Code section 9.32, regarding deadly force, provides, in part:

(a)    A person is justified in using deadly force against another:

　　(1)    if the actor would be justified in using force against the other under Section 9.31; and

　　(2)    when and to the degree the actor reasonably believes the deadly force is immediately necessary:

　　　　(A)    to protect the actor against the other's use or attempted use of unlawful deadly force; or

　　　　(B)    to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

(b)    The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision is presumed to be reasonable if the actor:

　　(1)    knew or had reason to believe that the person against whom the deadly force was used:

　　　　[. . .]

　　　　(C)    was committing or attempting to commit an offense described by Subsection (a)(2)(B);

39

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

*Id*. § 9.32(a) (b).

Because section 9.32(b) creates a presumption in favor of the defendant, certain consequences apply according to Texas Penal Code section 2.05(b), including:

(1) if there is sufficient evidence of the facts that give rise to the presumption, the issue of the existence of the presumed fact must be submitted to the jury unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact[.]

*Id*. § 2.05(b)(1). Section 2.05(b)(2) mandates additional instructions that must accompany a presumption-of-reasonableness instruction. *Id*. § 2.05(b)(2)(A)-(D). Miranda argues section 2.05 applies in this case because there was sufficient evidence of facts giving rise to the presumption. We disagree.

Section 9.32 Subsection (a)(2) describes "when" the use of deadly force "is justified[,]" and Subsection (b) specifies the conditions under which "[t]he actor's belief under Subsection (a)(2)… is presumed to be reasonable[.]"*Id*. § 9.32(a)(2). In the absence of evidence that Miranda provoked Jose or that Miranda was "otherwise engaged in criminal activity," the only condition in dispute is whether Miranda "knew or had reason to believe" Jose "was committing or attempting to commit an

40

offense described by Subsection (a)(2)(B)[.]" *Id*. § 9.32(b)(1)(C). Of those, murder is the only offense of which Miranda has ever argued there was evidence. The statute uses the past progressive (or past continuous) tense of the verbs in the phrases "was committing… murder" and "was attempting to commit… murder[.]" *Id*.; Grammarly, https://www.grammarly.com/blog/ grammar/past-continuous-tense (last visited Oct. 13, 2025). "The past progressive tense is used to refer to an ongoing past action that was interrupted by another past action." Scribbr, https://www.scribbr.com/verbs/past-progressive (last visited Oct. 13, 2025). Therefore, the presumption of reasonableness would apply in this case only if there were evidence that when Miranda used deadly force, he knew or had reason to believe Jose was, at that time, committing or attempting to commit murder. Otherwise, no instruction on the presumption was required to be included in the charge.

As evidence "that Miranda had reason to believe that [Jose] was committing or attempting to commit murder[,]" Miranda points to evidence in the record that:

> Miranda and [Clarissa]'s pre-trial statements and testimony all confirm that [Jose] repeatedly threatened to kill (murder) both [Clarissa] and Miranda. They both believed the threats to be real and feared for their lives. [Jose] was the first aggressor, after the first threat against [Clarissa], "Before I leave this bitch, I'm going to kill you," he leaves the house starts his diesel truck comes back inside, repeats the threats to kill and tries to push his way back in the bedroom to attack [Clarissa] which in turns into a fight. Moreover, when Miranda attempts to get [Jose] to calm down [Jose] continues to fight and reaches for Miranda's concealed pistol. Furthermore, Miranda had reason to believe that

41

[Jose] would immediately follow thru on his threats to kill after his acts of violence, refusal to calm down, and efforts to get the pistol, Miranda already knew about [Jose] history of violence against family members, and was a victim himself of a drunk [Jose], [Jose] pulled a gun on Miranda after Miranda confronted him about slapping [Clarissa].

The question is not whether Miranda subjectively believed deadly force was immediately necessary to protect himself or Clarissa from Jose's use or attempted use of deadly force; the question is whether the court was required to instruct the jury to presume Miranda's belief was a reasonable one, and in order to activate such a presumption there must have been evidence satisfying section 9.32(b)(1)(C). Jose's threats to murder Miranda or Clarissa in the future, especially threats conditioned on the occurrence of some future event such as getting free from the headlock, do not satisfy the language of the statute which required Miranda to know or to have reason to believe that murder was being committed or attempted at the time Miranda used deadly force.

Miranda's assertion that Jose was reaching for Miranda's pistol is not supported by the record. During Miranda's interview in the patrol car, he initially told the officer that Jose "tried to grab my pistol [and] I pulled it out of my pocket and cocked it." But at the station, Miranda explained that Jose "patted" Miranda's pocket where he knew Miranda kept his gun, and said, "Come on, use it. Use it. Use it." Miranda further explained, "He wasn't going for it. He knows better than that. He was tapping it like trying to instigate the thing." But even if Miranda had

42

reason to believe Jose was trying to grab the pistol before Miranda pulled it out of his pocket, there is no evidence Jose ever tried to do so after Miranda pulled it from his pocket, and the evidence conclusively showed that Miranda exercised complete and exclusive control over the pistol from that point forward by unloading, reloading, charging and firing it, all with one hand. If Jose ever was reaching for the gun, he no longer was when he was shot. He was unarmed, and in a "full-blown chokehold." Although he was still making threats to kill Miranda and Clarissa, there is no evidence he was attempting to carry out his threats, nor that he had the ability to do so. There was no evidence that would give Miranda a reason to believe Jose was murdering or attempting to murder anyone when Miranda shot him. Therefore, Miranda was not entitled to an instruction on the presumption of reasonableness under section 9.32(b), nor any of the instructions prescribed by section 2.05(b). "When the presumption of reasonableness is not raised by the evidence, the trial court does not err by omitting an instruction on the issue." *Smith v. State*, No. 05-22-00491-CR, 2023 Tex. App. LEXIS 8223, at *10-11 (Tex. App.—Dallas Oct. 30, 2023, no pet.) (mem. op.) (not designated for publication). We overrule Miranda's second issue.

*Issue Three – Duty to Retreat*

In his third issue, Miranda claims the trial court erred by failing to include an instruction that he had no duty to retreat. Penal Code section 9.31 provides:

(e)    A person who has a right to be present at the location where the force is used, who has not provoked the person against whom the force is used, and who is not engaged in criminal activity at the time the force is used is not required to retreat before using force[.]

(f)    For purposes of Subsection (a), in determining whether an actor described by Subsection (c) reasonably believed that the use of force was necessary, a finder of fact may not consider whether the actor failed to retreat.

Tex. Penal Code Ann. § 9.31(e), (f); *see also* § 9.32(c), (d) (regarding deadly force). Miranda did not request any instruction on the law of retreat, nor did he object to its omission, but on appeal Miranda essentially argues that the trial court was required to submit the instruction *sua sponte* and that the trial court's failure to do so was erroneous because the record contains sufficient evidence to support such an instruction.

Texas Code of Criminal Procedure article 36.14 requires the trial judge to deliver to the jury "a written charge distinctly setting forth the applicable law to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14; *see Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). The trial judge must give an instruction on any defensive issue that is requested and raised by the evidence. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013); *Dugar v. State*, 464 S.W.3d 811, 816 (Tex.

44

App.—Houston [14th Dist.] 2015, pet. ref'd). A defensive issue is raised by the evidence if there is some evidence on each element of a defense that, if believed by the jury, would support a rational inference that the element is true. *Krajcovic,* 393 S.W.3d at 286; *Dugar*, 464 S.W.3d at 816. Article 36.14 generally requires defendants to object to errors in the charge before complaining on appeal. *Posey v. State*, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998); Tex. Code Crim. Proc. Ann. art. 36.14. "However, the judge's duty to instruct the jury on the law applicable to the case exists even when defense counsel fails to object to inclusions or exclusions in the charge; this may require the judge to *sua sponte* provide the jury with the law applicable to the case, under Article 36.14." *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011).

> The trial judge has an absolute *sua sponte* duty to prepare a jury charge that accurately sets out the law applicable to the specific offense charged. But it does not inevitably follow that he has a similar *sua sponte* duty to instruct the jury on all potential defensive issues, lesser-included offenses, or evidentiary issues. These are issues that frequently depend upon trial strategy and tactics.

*Delgado*, 235 S.W.3d at 249. A trial court need not *sua sponte* instruct a jury on defensive issues, because an unrequested defensive issue is not "the law 'applicable to the case.'" *Vega*, 394 S.W.3d at 518-19; *Oursbourn v. State*, 259 S.W.3d 159, 178-80 (Tex. Crim. App. 2008); *Posey*, 966 S.W.2d at 62; Tex. Code Crim. Proc. Ann. art. 36.14. Instead, a defendant must timely request an instruction or object to its omission from the charge. *Taylor*, 332 S.W.3d at 487; *Posey*, 966 S.W.2d at 62.

45

Section 9.32 includes several sections, all of which include several theories or options that could be submitted to the jury. *See Barrios v. State*, 389 S.W.3d 382, 395 n.16 (Tex. App.—Texarkana 2012, pet. ref'd) ("A general objection that the charge fails to charge the jury on the issue of self-defense does not preserve error absent a written instruction or dictation as to the instruction sought. This is because a self-defense instruction could refer to instruction under Section 9.31, 9.32, or 9.33, all of which have several options or theories available which could be submitted to the jury."); *see also Allen v. State*, No. 03-15-00420-CR, 2017 Tex. App. LEXIS 3938, at *4 (Tex. App.—Austin May 2, 2017, pet. ref'd) (internal citations omitted) (mem. op., not designated for publication) ("[S]elf-defense is not a single issue but rather a constellation of issues dealing with the justification of the use of force. Therefore, if the defendant requests an instruction on one self-defense issue, the trial court is not obligated to include every possible self-defense instruction in the jury charge."); *Smith*, 2023 Tex. App. LEXIS 8223, at *8-10 (trial court has no duty to *sua sponte* include an instruction on the presumption of reasonableness, even if raised by the evidence).

To preserve a complaint for appellate review that the trial court did not instruct the jury on a particular self-defense issue, the defendant must request the instruction and object to the omission of the instruction, or the issue is forfeited. *See Stratton v. State*, No. 09-22-00140-CR, 2023 Tex. App. LEXIS 4989, at *26 (Tex. App.—

46

Beaumont July 12, 2023, pet. ref'd) (mem. op.) (not designated for publication) (stating rules of error preservation require defendants, as to a particular self-defense issue, to request the instruction and object to its omission); *Allen*, 2017 Tex. App. LEXIS 3938, at *2-3 (same). Sections 9.31 and 9.32 do not impose a duty on the trial court to provide *sua sponte* instructions on the law of retreat. Without that request, he cannot demonstrate error in the charge. *Vega*, 394 S.W.3d at 519; *Posey,* 966 S.W.2d at 61-62; *see also* Tex. Penal Code Ann. §§ 9.31, 9.32; Tex. R. App. P. 33.1(a) (requiring complaint to be preserved in the trial court by a timely request, objection, or motion). Since Miranda did not request such an instruction, Miranda has forfeited that issue on appeal. *Posey*, 966 S.W.2d at 62-63; *Stratton*, 2023 Tex. App. LEXIS 4989, at *25-26; *Allen,* 2017 Tex. App. LEXIS 3938, at *8-9. We overrule Miranda's third issue.

*Issue Four – Reasonable Doubt*

In his fourth issue, Miranda argues that the trial court violated Texas Penal Code section 2.03(d) when it submitted the defense-of-a-third-person instruction in its charge, but did not instruct that a reasonable doubt on the defense requires Miranda to be acquitted. The State concedes error.

Texas Penal Code section 2.03(d) states, "If the issue of the existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on the issue requires that the defendant be acquitted." Tex. Penal Code Ann. § 2.03(d).

47

The trial court submitted an instruction on defense of third person but did not include an instruction on how the law of reasonable doubt applies in the context of that defense. As stated above, when the trial court submits a defensive issue, any flaw in the charge on the defensive issue constitutes charge error necessitating evaluation of harm under *Almanza*. *See Barrera*, 982 S.W.2d at 416; *Vega*, 394 S.W.3d at 519. For that reason, we agree that charge error occurred. But because Miranda did not request such an instruction nor object to its omission, Miranda must show the error caused egregious harm. *See* Tex. R. App. P. 33.1(a); *Almanza*, 686 S.W.2d at 171-72.

*Issues One and Four - Egregious Harm Analysis*

Having found in issue one that the charge failed to properly instruct the jury that Miranda would be justified in using deadly force to protect Clarissa, and having found in issue four that the charge failed to instruct the jury to acquit Miranda if it had a reasonable doubt on his defense-of-a-third-person defense, we must determine whether either of these errors, neither of which was preserved by an objection or request, resulted in egregious harm. *See Almanza*, 686 S.W.2d at 171; Tex. R. App. P. 33.1(a).

"Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (quoting *Reeves v. State*, 420 S.W.2d 812,

816 (Tex. Crim. App. 2013)); *see Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) ("[Egregious harm] is a difficult standard to meet and requires a showing that the defendants were deprived of a fair and impartial trial."). An error results in egregious harm only if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Galinas v. State*, 378 S.W.3d 703, 718 (Tex. Crim. App. 2013). The harm must be "so harmful that the defendant was denied 'a fair and impartial trial[,]'" or actual egregious harm. *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986). When analyzing whether charge error results in egregious harm, we must examine "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

## A. The Entirety of the Charge

The portions of the charge relevant to Miranda's defensive theories are set forth in their entirety above. Paragraph 5 accurately instructed the jury in the abstract that a person is justified in using deadly force if he would be justified in using force in the first place, and when he reasonably believes that such deadly force is immediately necessary to protect himself against another person's use or attempted use of unlawful deadly force, or to prevent the other's imminent commission of murder. Because the instruction does not restrict the word "murder" to a particular

49

person, Miranda's use of deadly force would be justified if he reasonably believed it was immediately necessary to prevent Jose's imminent murder of Miranda or Clarissa.

The charge also included paragraph 22 which instructed the jury that when a person reasonably believes "a third person is under attack or attempted attack with unlawful deadly force," then the person is justified "in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect… a third person from such attack or attempted attack."

Paragraph 25 instructed the jury that if it reasonably appeared to Miranda from Jose's words or conduct, or both, that Clarissa's life was in danger, and if Miranda reasonably believed it was immediately necessary for him to use deadly force to protect Clarissa against Jose's use or attempted use of unlawful deadly force, then the jury "should acquit the defendant on the grounds of defense of a third person; and say by [its] verdict 'NOT GUILTY.'"

The inclusion of paragraphs 5, 22 and 25 in the charge tended to mitigate any harm which may have resulted from the erroneous language of paragraph 20, because while paragraph 20 failed to adequately instruct the jury that Miranda would be justified in using deadly force to protect Clarissa from Jose's use or attempted use of deadly force, paragraphs 5, 22 and 25 did so.

50

Although the charge did not include a section 2.03(d) instruction specifically requiring the jury to acquit Miranda if it had a reasonable doubt on his defense-of-a-third-person defense, the charge did include the following instructions:

> If you all agree the State has proved each of the four elements listed above, beyond a reasonable doubt, you must next decide *whether the State has proved that the Defendant's conduct was not justified by* self defense and/or *defense of a third person*.
>
> [. . .]
>
> If you all agree the State has proved, beyond a reasonable doubt, each of the elements of the offense of Murder, and you also believe, beyond a reasonable doubt, that the defendant did not act in self-defense, you must find against the defendant on the issue of self-defense, and you must next decide *whether the State has proved beyond a reasonable doubt that the Defendant's conduct was not justified by a defense of a third person*.
>
> […]
>
> If you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will find the defendant "not guilty."
>
> […]
>
> The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case. (Emphasis added).

These instructions placed the burden on the State to prove beyond a reasonable doubt that Miranda's use of deadly force in defense of Clarissa was not justified. They further instructed the jury to return a verdict of "not guilty" if, after considering all the evidence, they had a reasonable doubt regarding Miranda's guilt. These

51

instructions mitigate any harm that may have resulted from the failure to include an instruction tracking the language of Texas Penal Code section 2.03(d) that "a reasonable doubt on the issue requires that the defendant be acquitted." Tex. Penal Code Ann. § 2.03(d).

We conclude the entirety of the charge weighs against a finding of egregious harm from either error.

B. The State of the Evidence

Because Miranda's first issue is that the charge failed to properly instruct the jury that Miranda would be justified in using deadly force in defense of a third person, we focus on evidence tending to show whether Miranda reasonably believed that his use of deadly force was immediately necessary to protect Clarissa from Jose's use of unlawful force or deadly force, or to protect Clarissa from imminent murder by Jose. *See id*. §§ 9.32(a)(2)(B), 9.33. Although Jose and Miranda were engaged in a physical altercation, the evidence was undisputed that Jose was unarmed, in a headlock, when Miranda shot him in the head. While in the headlock, Jose continued to make verbal threats that he would kill Clarissa, but there was no evidence of an imminent attempt to murder her when Miranda shot Jose. Miranda testified:

> [DEFENSE COUNSEL]: Q. But the truth is, all he did was say something aggressive. If "I'm going to kill you" is interpreted as aggressive, all he did was use his words; yes?

A. Yes.

Q. You did not see him hit Clarissa on the night you shot him?

A. No, ma'am.

Q. You did not see him with a gun in his hand?

A. No, ma'am.

Q. You did not see him with a knife in his hand?

A. No, ma'am.

Q. You did not see him using any part of his body to physically harm Clarissa?

A. No, ma'am.

Q. Instead, Clarissa and Jose were arguing; yes?

A. Yes, ma'am.

Q. He's yelling at her; yes?

A. And threatening to kill her, yes.

Q. And she is yelling at him?

A. Yes.

Q. He wants to leave; right? He wants to leave the house?

A. He grabbed his bag and grabbed his truck, yes.

Q. She stops him; yes?

A. She grabbed the bag.

Q. She tells him to go to bed; yes?

A. Yes. Yes, ma'am.

Q. And that's a choice she made, to tell him to go to bed?

53

A.    Yes, ma'am.

Q.    Even after you're saying he threatened to kill her, she told him to go to bed?

A.    Yes.

To be justified under either section 9.32 or section 9.33, Miranda's use of deadly force to protect Clarissa from Jose must first have been justified under section 9.31 which states, "The use of force against another is not justified: (1) in response to verbal provocation alone[.]" *Id*. § 9.31(b)(1). Despite Jose's verbal threats, there was no evidence Jose was using or attempting to use any force, much less deadly force, against Clarissa when Miranda shot Jose. Clarissa testified she was fearful that if Jose had freed himself from the headlock, he would have killed her. But he wasn't free, and there was no evidence that Miranda's use of deadly force was immediately necessary when Miranda had Jose in a headlock that was sufficiently secure to allow Miranda to retrieve and manipulate his pistol, in the way he described, without Jose's escaping and attempting to harm Clarissa.

Considering the entire record, Miranda's defense-of-a-third-person evidence was weak when viewed together with the remainder of the evidence, and we cannot conclude there is a substantial risk Miranda was egregiously harmed by the erroneous wording of the instruction on the use of deadly force in defense of a third person or by the omission of an instruction tracking the language of section 2.03(d). *See Villarreal*, 453 S.W.3d at 439-40 (finding no egregious harm was caused by the

54

omission of a presumption-of-reasonableness instruction where the victim was unarmed after the defendant took the victim's weapon away).

C. The Arguments of Counsel

Miranda's counsel reminded the jury, the State "has to prove that self-defense and the defense of the third person beyond a reasonable doubt don't apply to this case." Although defense counsel primarily argued self-defense, he also zealously argued that Miranda killed Jose because Miranda feared for his mother's life. Defense counsel argued Miranda "did the only thing he could do," because Jose said, over and over, "I'm going to kill your mother." According to defense counsel, Miranda believed Jose:

> He believed that if Jose got free and he knew -- and like the -- the concept that he could have gone, "Okay, Jose, enough, go," and he knew what would have happened. In his heart of hearts, he knew Jose would have gotten a hold of a knife, a clock, something, and would have killed -- or a gun -- and killed his mother and done his best to kill him. And he did try step by step by step to stop it.

> His use of self-defense and defense for his mother was reluctant. It was hesitant. It was graduated. It was not planned. And it was his best friend. It was his father. And he didn't do that for fun. He didn't do that for hate. He didn't do that for money. He did it to protect himself and to protect his mother.

Neither the improper wording of paragraph 20 nor the omission of an instruction based on section 2.03(d) prevented Miranda's counsel from arguing that the jury should acquit Miranda on the grounds he used deadly force because he reasonably believed it to be immediately necessary to prevent his mother's death.

55

The State's counsel did not use the improper wording of paragraph 20 as a basis for refuting defense counsel's arguments. Rather, the State's counsel argued the evidence proved that Miranda's belief was not reasonable and that there was no immediate need for the use of deadly force. In other words, both sides appear to have made the same arguments they would have made if paragraph 20 had been worded correctly and if the jury had been instructed to acquit Miranda if it had reasonable doubt on his defense-of-a-third-person defense.

We conclude the arguments of counsel weigh against a finding of egregious harm from either error.

D. Other Relevant Information

We do not find any other information relevant to the harm analysis.

We conclude the record fails to indicate the existence of egregious harm resulting from either error in the charge. We overrule Miranda's first and fourth issues.

*Issue Five - Ineffective Assistance of Counsel*

In his fifth issue, Miranda argues that his trial attorneys rendered ineffective assistance of counsel because "they did not object to the jury charge and requested the correct jury instructions on justification, presumption of fact, the instruction that the jury may not consider failure to retreat, and the instruction that a reasonable doubt on his defense of third party requires acquittal, to support Miranda's defense

56

that deadly force was justified." Miranda argues that counsel's performance was so deficient that he did not receive a fair trial and that it was in violation of the United States Constitution, the Texas Constitution, and the Texas Code of Criminal Procedure.

"Evaluating claims of ineffective assistance of counsel under the Sixth Amendment involves a two-pronged test: (1) whether counsel was deficient, and (2) whether the defendant suffered prejudice as a result of counsel's error." *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish counsel's deficient performance, an appellant must show by a preponderance of evidence that counsel's actions fell below an objective standard of reasonableness. *Id*.; *see also Strickland*, 466 U.S. at 687-88. "Under *Strickland,* the defendant must prove, by a preponderance of the evidence, that there is, in fact, no plausible professional reason for a specific act or omission." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Our review of counsel's performance is highly deferential, and we presume they provided reasonable assistance. *See id*. at 833. We afford counsel a strong presumption that their conduct falls within a wide range of reasonable professional assistance, and a defendant must overcome this presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *Hart*, 667 S.W.3d at 781; *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021) (citation omitted). To overcome this

presumption, "[a]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Tanner v. State*, 707 S.W.3d 371, 377 (Tex. Crim. App. 2024); *see also Johnson*, 624 S.W.3d at 586; *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

"Under most circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the strong presumption that counsel's conduct was reasonable and professional." *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004); *see also Hart*, 667 S.W.3d at 782. Ordinarily, trial counsel should be given an opportunity to explain their conduct before being considered ineffective. *Id*. Without this, and faced with an undeveloped record on direct appeal, we "'commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it.'" *Id*. (quoting *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013)). We will consider counsel's actions deficient only if we find no reasonable trial strategy could justify counsel's acts or omissions, regardless of their subjective reasoning. *See id*. (quoting *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011)).

The record does not indicate that Miranda filed a motion for new trial alleging ineffective assistance, and the record is undeveloped regarding counsel's trial

58

strategy and decisions. *See Graves v. State*, 310 S.W.3d 924, 929 (Tex. App.—Beaumont 2010, pet. ref'd). With no opportunity for trial counsel to explain his actions, we assume he had a strategic reason for his decisions. *See Hart*, 667 S.W.3d at 782. In addition, trial counsel's ineffectiveness is not apparent from the record. *See Freeman v. State*, 125 S.W.3d 505, 506-07 (Tex. Crim. App. 2003). Although defense counsel did not object to the erroneous wording of paragraph 20, other paragraphs in the charge adequately instructed the jury on Miranda's defense-of-a-third-person defense. And although counsel did not request an instruction requiring the jury to acquit Miranda if it had a reasonable doubt on Miranda's defense-of-a-third-person defense, the charge included other instructions properly placing the burden on the State to disprove the defense beyond a reasonable doubt and instructing the jury to find Miranda "not guilty" if it had reasonable doubt as to his guilt. *See Russell v. State*, No. 05-22-00462-CR, 2023 Tex. App. LEXIS 6127, at *16 (Tex. App.—Dallas Aug. 14, 2023, no pet.) (mem. op.) (not designated for publication) (counsel's failure to request a specific instruction based on section 2.03(d) was not deficient when the charge contained instructions on the State's burden of proof and defendant's presumption of innocence).

Miranda has not defeated the strong presumption that counsel's decisions during the trial fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Hart*, 667 S.W.3d at 782; *see also Beatty v. State*,

59

No. AP-75,010, 2009 Tex. Crim. App. Unpub. LEXIS 167, at *28-29 (Tex. Crim. App. Mar. 11, 2009) (per curiam) (not designated for publication) (overruling complaint that counsel was ineffective for failing to request a charge on self-defense when record on direct appeal did not overcome the strong presumption that counsel's conduct was reasonable and professional). We find nothing in the record showing that trial counsel's actions were so outrageous that no competent attorney would have engaged in them, and we hold that Miranda failed to establish trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 687; *Hart*, 667 S.W.3d at 781-82, 784. We overrule Miranda's fifth issue.

## Conclusion

Having overruled all of Miranda's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on March 17, 2025
Opinion Delivered November 5, 2025
Do Not Publish

Before Johnson, Wright and Chambers, JJ.